IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

RICHARD FAUST, as the Personal Representative

of the Estate of K.F., ASHLEY FAUST, individually,

and JUSTIN FREDERICK, individually,

    Plaintiffs,

-vs-                    Case No. 5:16-CV-00961-F

GENERAL MOTORS, L.L.C., HUDIBURG BUICK-GMC, L.L.C.,

AUTOLIV ASP, INC., and DELPHI AUTOMOTIVE, L.L.C.,

    Defendants.
_____/

The video deposition of DAVID PRENTKOWSKI was taken by the Plaintiffs on Thursday, May 3, 2018, at 2501 Worldgateway Place, Detroit, Michigan, at 10:35 a.m.

APPEARANCES:

DENNEY & BARRETT, P.C.

Jason Robinson

870 Copperfield Drive

Norman, Oklahoma 73072

405.364.8600

jrobinson@dennbarr.com

Appearing on behalf of the Plaintiffs.


Reported by: Cindy A. Boedy, CSR 4696

            Certified Court Reporter

EXHIBIT 1

```
 1   JENNINGS TEAGUE, P.C.
 2   James A. Jennings
 3   204 N. Robinson
 4   Suite 1000
 5   Oklahoma City, Oklahoma  73102
 6   405.609.6000
 7   jjennings@jenningsteague.com
 8   Appearing on behalf of the Defendant Autoliv.
 9
10   MCAFEE & TAFT
11   Harold C. Zuckerman
12   Two West Second Street
13   Suite 1100
14   Tulsa, Oklahoma  74103
15   918.587.0000
16   harold.zuckerman@mcafeetaft.com
17   Appearing on behalf of the
18   Defendant General Motors.
19
20   Video operator:  Tim Reitman
21
22
23
24
25
```

1                that correct?

2    A.     Correct.

3    Q.     And then there would be a team designated for the
4           tongue design?

5    A.     That's correct.

6    Q.     And then there would be a team designated for the
7           buckle design?

8    A.     That's correct.

9    Q.     And so at every point along the way, there's
10          somebody at Autoliv who is designing these
11          portions of the belt, correct?

12   A.     Correct.

13   Q.     And, additionally, there is a team designated
14          just for the webbing?

15   A.     Correct.

16   Q.     So if I say that Autoliv designed this belt
17          system that's in this vehicle and manufactured
18          it, that would be correct?

19               MR. JENNINGS: Object to the form.

20               THE WITNESS: I'm getting stuck on your
21          use of the word "belt system." Because I design
22          -- Autoliv designs components that are capable of
23          being assembled into a seat belt assembly, but
24          it's the customer that designs the functionality
25          of what that seat belt system is being asked to

1  do in their environment with the rest of the
2  restraint system components and the vehicle
3  body-in-white and the seat and the steering wheel
4  and the steering column, everything else that
5  makes up the overall vehicle-level restraint
6  system.
7  BY MR. ROBINSON:
8  Q.  I understand.
9  A.  Autoliv develops components.  We assemble
10 components based on what the customer is asking
11 for and then we sell the component -- that
12 assembly of components called the seat belt
13 assembly to the customer, provided it meets their
14 functional requirements and expectations.
15 Q.  So let me see if I got this right.  The customer
16 sets the functional expectations of the seat
17 belt?
18 A.  Correct.
19 Q.  And the customer does that based on their own
20 analysis?
21 A.  That is correct.
22          MR. ZUCKERMAN:  Object to the form.
23 I'm sorry.
24 BY MR. ROBINSON:
25 Q.  To your knowledge, they do that based on their

Page 31

1   as specified by the customer because the customer
2   is responsible for meeting the requirements of
3   208.  So we assume that if we meet the
4   requirements that the customer has laid out when
5   they do their testing and validation to the
6   requirement of FMVSS 208 that it meets those
7   requirements.
8  Q.  Are you suggesting that Autoliv does none of the
9      testing to guarantee that it meet -- that the
10     products meet the FMVSS standards?
11 A.  Autoliv provides products that meet the customer
12     specification and requirement.  The customer is
13     the one that is responsible for the vehicle, they
14     are the ones responsible for the rest of the
15     interior components that make up the rest of the
16     restraint system.  They are the ones that have
17     specified their restraint system philosophy or
18     occupant protection strategy.  They are the ones
19     that have specified what the air bag or seat belt
20     should look like and what components and features
21     it should include.
22          So we focus on meeting what the
23     customer is asking for, knowing the customer is
24     responsible for meeting the requirements of 208,
25     and when they test, they do.

1 Q. Does the customer provide you those goals?

2 A. In general, no.

3 Q. No?

4 A. They may say in general terms we want this to be
5 a five-star vehicle or something like that.

6 Q. And --

7 A. But otherwise, they provide us a component
8 specification. If I go back to the retractor,
9 they want a load-limiting pretensioning retractor
10 capable of meeting this particular load-limiting
11 characteristic curve and that's what we work to
12 provide.

13 Q. So what your testimony is is that Autoliv is not
14 aware of what -- or Autoliv was not aware of GM's
15 goals with regard to the 2008 to 2012 Chevy
16 Malibu?

17 A. Well, again, define "goals." The overall
18 restraint system and occupant protection
19 strategy? No, we're not. We're -- the goal --
20 our goal is meeting the specific performance
21 requirement that is provided to us.

22 Q. Does Autoliv participate in testing with General
23 Motors with regard to their products when Autoliv
24 provides either a seat belt or an air bag so that
25 Autoliv engineers can make notes or make changes

1    to their products to meet the requirements or
2    design goals of General Motors?
3 A. I'm going to give you a two-part answer. First
4    answer is if there's a specific -- I mean in
5    terms of goals or, you know, FMVSS 209 and
6    General Motors seat belt performance
7    specifications have very specific requirements
8    for the seat belt, the seat belt sub assembly.
9    That seat belt assembly and those performance
10   requirements are essentially static tests. There
11   is no testing that we perform in conjunction with
12   the air bag or with the rest of the system. All
13   vehicle system-level testing and overall
14   restraint system-level testing is done by General
15   Motors.
16           So part two of that answer is in
17   general no. Autoliv seat belt or air bag
18   engineering is not present at General Motors
19   vehicle-level and system-level testing because
20   General Motors is the integrator of all the
21   components that make up their overall restraint
22   system package.
23           They are the ones defining and managing
24   what the restraint system looks like and how it
25   performs to achieve their own internal

1      performance goals.
2  Q.  Would you agree with me that Autoliv designed and
3      manufactured the right front seat belt assembly
4      that was in the 2012 Chevy Malibu?
5  A.  Well, I think I kind of answered that before in
6      that General Motors selected the components that
7      go into the seat belt assembly to meet their
8      particular requirements and then we assemble and
9      test to validate the General Motors requirement
10     specifications.
11 Q.  Did you design all the components that are
12     involved in the R230 seat belt or retractor sub
13     group?
14 A.  For the retractor itself, yes.  To answer your
15     question, we designed every component in the seat
16     belt assembly except for the General Motors
17     directed Takata crash-locking tongue that was
18     used in that seat belt.  We were told by General
19     Motors to use that part.
20 Q.  Okay.  So it's fair for me to say that Autoliv
21     designed every aspect of the seat belt other than
22     the tongue of the seat belt assembly for the
23     passenger side of that vehicle and that it
24     manufactured the entire seat belt assembly?
25              MR. JENNINGS:  Object to form.

1    THE WITNESS: Correct.
2    BY MR. ROBINSON:
3    Q.   All right. Now, for the air bag module that was
4         in the -- on the passenger side of the -- or the
5         right front passenger, the frontal air bag system
6         or air bag module, if I ask the same question,
7         did Autoliv design all of the components to that
8         air bag module?
9    A.   Can I go back first and append my last response?
10   Q.   Sure.
11   A.   The one -- I guess the one additional thing I'd
12        like to add is inside the retractor, it's a
13        pretensioning retractor and it is a load-limiting
14        retractor. So we offer multiple options for the
15        level of pretensioning and the customer makes the
16        decision on which level of pretensioning they
17        would like to use. I mean, we design the
18        component that provides that function, but the
19        customer is the one that is asking for, I'll say,
20        a higher level of pretensioning force or a lower
21        level of pretensioning force.
22                  And that's also true of the torsion bar
23        that is part of the load limiter. We offer
24        multiple options for torsion bars, but it's
25        ultimately General Motors that decides which

1  torsion bar -- we design a component, but we
2  design multiple components, multiple options, and
3  General Motors is the one that figures out which
4  one they want or need for their particular
5  application.
6         So the same is true from an air bag
7  standpoint. We design the inflator module. We
8  design the air bag itself based on feedback or
9  information provided by General Motors that says
10 we need a bag of approximately this volume with
11 approximately this size front panel for interface
12 with the occupant. And as they are doing their
13 vehicle-level testing, if they need a bigger bag,
14 then they let us know they need a bigger bag and
15 we try to design a bigger front panel.
16        If they decide they need something
17 different from a venting standpoint, then they
18 will tell us that, Hey, we need you to do
19 something with your venting, so we'll modify the
20 venting, provide additional samples which they
21 will test in their system and let us know if it
22 met their expectation.
23        So designing at the component level for
24 the air bag module, yes, but to design the
25 overall air bag and how it deploys and all of

1          MR. ZUCKERMAN:  Thank you.
2  BY MR. ROBINSON:
3  Q.   So you're aware that can happen, okay.  And do
4       you design your seat belts with that awareness?
5  A.   We design our seat belts to meet our customer
6       requirements and expectations and regulatory
7       requirements.
8  Q.   Okay.  Do you ever tell your customers, Hey, you
9       know, this seat belt is great with an air bag,
10      but if you don't have an air bag, the seat belt
11      is not going to work for you?
12 A.   Well, the air bag does work because it does lock
13      and it does restrain the occupant.  But, again,
14      we're designing seat belts to meet our customer
15      and regulatory requirements.
16 Q.   That didn't answer my question at all.  Have you
17      ever told a customer, any customer to your
18      knowledge, that -- has Autoliv ever said to a
19      customer, You know what?  If your air bag fires
20      or if this air bag fires, this seat belt is going
21      to work great, but -- or anything to that
22      effect -- but if the air bag does not fire, this
23      seat belt is not going to offer an adequate level
24      of protection to the occupant?
25 A.   I don't believe anybody from Autoliv has ever

1     made that comment, but that would be a common
2     sense readily understood condition at General
3     Motors to begin with.
4  Q. Okay. So you think General Motors would already
5     know that if the air bag doesn't fire, the seat
6     belt may not work properly?
7           MR. ZUCKERMAN: Object to form.
8           THE WITNESS: I believe that General
9     Motors would know that air bags and seat belts
10    are designed to work together, and if one of
11    those components doesn't do what it was designed
12    to do, you're going to have less-than-optimum
13    restraint.
14 BY MR. ROBINSON:
15 Q. And you said you haven't really looked into this
16    case, correct?
17          MR. JENNINGS: Object.
18 BY MR. ROBINSON:
19 Q. Into the specific facts of this accident.
20 A. I have not.
21 Q. Are you aware that -- sorry. Are you aware that
22    Ms. Faust, ███████████ was in the passenger
23    seat with her seat belt on and that she suffered
24    a subdural hematoma as a result of not receiving
25    an air bag in a frontal accident?

Page 86

1         MR. JENNINGS:  Object to the form.
2         MR. ZUCKERMAN:  Object to form.  Sorry,
3    Jim.
4         MR. JENNINGS:  Sounds like we both
5    object to the form of the question.
6         THE WITNESS:  I know that the seat was
7    occupied and that she was wearing a seat belt and
8    there was no air bag deployment.  Beyond that I
9    don't.
10   BY MR. ROBINSON:
11   Q.   You weren't aware that she suffered a subdural
12        hematoma from hitting her head?
13   A.   No.  No details on injury.
14   Q.   Now, your testimony was that the seat belt and
15        air bag are meant to work as a system.  Is that
16        what I understand you saying?
17   A.   Correct.
18   Q.   Okay.  And you, "you" being Autoliv -- to solve
19        that infection -- "you" being Autoliv, designed
20        the seat belt and air bag for General Motors with
21        the understanding that they would work as a
22        system?
23   A.   Well, the system integration and the actual
24        vehicle-level work is done by General Motors.
25        The seat belt application team develops the seat

Cornerstone Court Reporting                    (877) 713-3377

1      belt to meet the General Motors seat belt
2      requirement and the air bag application team
3      designs the air bag to meet the General Motors
4      air bag application requirements.
5              How those two work together in the
6      vehicle are determined and managed by General
7      Motors.
8   Q.  Okay. So Autoliv takes no responsibility for how
9       the seat belt and air bag work together?
10              MR. JENNINGS: Object to form.
11              THE WITNESS: The answer is no. We
12      don't design the vehicle or manage the occupant
13      restraint system package or -- again, that's
14      General Motors that is managing the occupant
15      restraint system and the philosophy for that
16      particular vehicle.
17  BY MR. ROBINSON:
18  Q.  Now, does Autoliv do crash testing?
19  A.  Autoliv has a facility -- has several facilities
20      capable of crash testing, yes.
21  Q.  Does Autoliv perform sled testing?
22  A.  We have sleds and are capable of performing sled
23      tests, yes.
24  Q.  Do you do product testing?
25  A.  Define "product testing."

1  Q.  Did Autoliv ever tell GM that that's the -- that
2      the limits on this force limiter that the limit
3      to the amount of spool-out is the amount of
4      webbing on the spool?
5  A.  I think I answered before.  General Motors has a
6      lot of very smart people in their crashworthiness
7      function.  They know how load-limiting retractors
8      work and they know that function of the limiting
9      retractor.  So did we actively tell them, no, but
10     they know that.
11 Q.  So the answer to my question is did you tell them
12     is no?
13 A.  No.  It's correct; it's no.
14 Q.  And you just relied on GM to know what you had
15     and to know what could be done.
16 A.  They are designing the restraint system.  Yes,
17     they know.
18 Q.  Does Autoliv send GM advertisements, catalogs, or
19     any kind of material to tell GM what the options
20     are in the -- for the seat belt system?
21 A.  We don't publish catalogs or advertise.  If a
22     customer is interested in a technology, they
23     typically arrange a technology review meeting.
24     And your follow-up question was did we ever have
25     a technology review meeting, and I'm sure we did.